Gary and Sandra HOWELL, Appellants,

v.

WELDERS PRODUCTS AND SERV-
ICES, INC., Respondent.

No. WD 31681.

Missouri Court of Appeals,
Western District.

Dec. 8, 1981.

Rehearing Overruled Jan. 12, 1982.

J. D. Williamson, Jr., John K. Weilert, Independence, for appellants.

Pieter A. Brower, Kansas City, for respondent.

Before SOMERVILLE, C. J., and CLARK and LOWENSTEIN, JJ.

LOWENSTEIN, Judge.

This is an appeal from the trial court's grant of a motion for directed verdict at the close of plaintiff's evidence in favor of defendant-respondent Welders Products and Services, Inc. and against plaintiffs-appellants Gary R. and Sandra Howell. Appellants brought a two count action for negligence, alleging (1) respondent's failure to provide sufficient means for lifting approximately 600 pound cylinders of liquid nitrogen into Mr. Howell's place of employment and (2) consequent consortium damages to Mrs. Howell.

Appellants' points on appeal concern two major issues which may have justified the trial court's failure to submit the case to the jury: (1) whether or not there was substantial evidence to attribute the *cause* of Mr. Howell's injury to the lifting of the cylinders; and (2) whether respondent had a *duty* to provide adequate means to transport the cylinders into Mr. Howell's place of work.

The judgment of the trial court is affirmed.

 On appeal of the grant of a directed verdict, the reviewing court must consider the evidence in a light most favorable to the appellant, giving it the benefit of all reasonable inferences, and disregarding evidence favorable to respondent. *Southwestern Bell Telephone Co. v. Chester A. Dean Construction Co.,* 370 S.W.2d 270, 274 (Mo. 1963). Further, negligence is ordinarily a jury question, and where different reasonable conclusions may be supported by the facts of a case, the question of negligence is almost always for the jury. *Fortner v. St. Louis Public Service Co.,* 244 S.W.2d 10, 13 (Mo.1951).

In this case, the evidence shows that Mr. Howell (hereinafter appellant) was the chief chemist and Assistant Director of the Kansas City Regional Crime Lab at the time of the alleged accident. Appellant had responsibility for making sure that a continuing supply of liquid nitrogen was available to keep operative the lab's x-ray spectrometer. Appellant arranged with respondent over the telephone for delivery of 5' × 2', six hundred pound cylinders of the liquid nitrogen to the crime lab. The director of the lab would sign the purchase orders. Delivery of the cylinders necessitated lifting the special dolly which the tanks were on up three stairs to the lab, a task which respondent's deliveryman could not accomplish alone. The deliveryman would invariably solicit assistance in lifting this dolly up the steps, and inevitably several of the lab employees would lend a hand.

Appellant, at the request of the director of the lab, complained to respondent about this mode of delivery, which culminated in several visits by three of respondent's representatives to examine the transportation problem in the fall of 1975. These representatives acknowledged that lab personnel should not have to assist its deliveryman, but no other method of delivery was provided. On July 19, 1976, appellant, along with two other employees, volunteered to help with the delivery of one of the cylinders, as he had done approximately 15–20 times before. This time, however, immediately after lifting he felt "a light-headed feeling" and complained of feeling "strained all over." Appellant testified that a few days after this incident he would awaken with a "catch" in his hip or back, the pain becoming progressively worse. On cross-examination, appellant testified that one week after the lifting incident he was leaning over a bed while investigating a homicide, and that when he straightened up felt a pain in his back similar to the pain he had been experiencing in the mornings since July 19th. Appellant testified that he had never had back problems before the July 19th lifting incident. The crime lab ceased doing business with respondent after this incident and thereafter built a ramp over the three steps to facilitate easy access to their building.

Over a month after the lifting incident, appellant first consulted with a Dr. Devins, who referred him to Dr. Glaser, the doctor who testified at trial. By this time, appellant testified he was dragging his leg around because it had no feeling in it, and that the pain had become severe. Dr. Glas-

er prescribed medication and total rest, and referred him to a neurologist, who performed a myelogram. Apparently no further treatment, beyond medication, was prescribed. When the pain persisted, appellant went into the hospital, a second myelogram was performed, and herniated disc was diagnosed. Surgery was performed the following day. Appellant testified that he did not relate the lifting incident to Dr. Glaser at the first appointment because he thought he was suffering from bone cancer or arthritis.

Dr. Glaser testified in answer to a hypothetical question based on the facts surrounding the lifting incident that the lifting incident "certainly could have caused the herniated disc." When respondent added to the hypothetical the homicide investigation incident and asked if the doctor was unable to attribute which incident caused the disc problem, the doctor answered "yes." The majority of the doctor's testimony contrasted a sudden onset as opposed to a gradual onset type of herniated disc condition, adding that he saw much of both types. Finally, the doctor testified that appellant had "a permanent impairment or function as a result of that particular medical problem."

Although the trial court did not state its reasons in its order sustaining the directed verdict, the court did tell the jurors upon their dismissal that "some of the basis" for the rulings was that the medical testimony as to causation was too uncertain to make a submissible case.

■ Even though "[t]he record tends to show that the trial court sustained defendants' motion on the theory that there was no adequate showing of proximate cause ... if the motion for a directed verdict was properly ruled, the reason assigned is immaterial." *Stewart v. Zuellig,* 336 S.W.2d 399, 402 (Mo.1960); *Hedgcorth v. Missouri Pacif-*

*ic Railroad Co.,* 592 S.W.2d 473, 476 (Mo. App.1979). Thus, assuming, without deciding, the trial court's decision concerning the issue of causation was correct, the fact remains that appellant's evidence failed to establish a tort duty for which respondent may be held liable.

Appellant's second point on appeal is that the trial court erred in directing a verdict for respondent because his evidence established, *prima facie,* that respondent had a tort duty to safely transport the cylinders of liquid nitrogen into appellant's laboratory. Appellant claims this duty arises out of the parties' oral contract to deliver those cylinders.

■ Respondent admits that a tort may be committed in the nonobservance of contract duties and that a negligent failure to perform a contractual undertaking may result in tort liability. *Helm v. Inter-Insurance Exchange for Automobile Club of Missouri,* 354 Mo. 935, 192 S.W.2d 417 (banc 1946). "An obligation may, likewise, be assumed by contract, out of which may arise a duty to others than the party to the contract." *Lowery v. Kansas City,* 337 Mo. 47, 85 S.W.2d 104, 110 (1935). Thus, where a defendant undertakes to perform a contract, he must exercise reasonable care for the safety of others and perform his duty skillfully, carefully, diligently and in a workmanlike manner. *Harzfeld's, Inc. v. Otis Elevator Co.,* 114 F.Supp. 480, 484–85 (W.D.Mo.1953). Respondent submits, however, that appellant failed to show that respondent had ever assumed an obligation to deliver the cylinders up the steps and into the crime lab, from which any tort duty could arise.[1]

In most cases involving torts committed in the non-observance of contract duty, the contract is written and the contract duties

---

1. The issue of appellant's own contributory negligence or, more likely, assumption of the risk, is almost necessarily juxtiposed into the consideration of the presence or absence of a tort duty. However, this issue is and should be separate from the question of duty. Even assuming there was a tort duty here, the question of assumption of the risk would be for the jury

as to whether appellant's choice to aid the deliveryman was made voluntarily and with knowledge and appreciation of the risk of injury involved. *Turpin v. Shoemaker,* 427 S.W.2d 485, 489 (Mo.1968); *Bullock v. Benjamin Moore and Co.,* 392 S.W.2d 10, 13–15 (Mo.App. 1965).

are clear. *Helton v. Hake,* 386 F.Supp. 1027, 1031 (W.D.Mo.1974); *Harzfeld's, Inc. v. Otis Elevator Co., supra; Wolfmeyer v. Otis Elevator Co.,* 262 S.W.2d 18, 22 (Mo. 1953); *Helm v. Inter-Insurance Exchange, supra.* In the instant case, the contract was oral (by telephone) and the specifics of that oral contract are not immediately clear. Appellant admits that almost every time the tanks of liquid nitrogen were delivered, he or some other employees were required to "volunteer" their service if they were to keep a supply of liquid nitrogen. No document was offered into evidence and appellant testified that he did not talk to any representative of respondent prior to the first delivery. Appellant's only attempt to establish respondent's contractual duty to adequately transport the cylinders into the lab was through evidence of subsequent actions and statements of respondent's representatives some two years after the first delivery and one year before the lifting incident which prompted this litigation.

 The theory of tort liability from the nonobservance of contract duties cannot be extended so far as to include the ephemeral, indefinite and implied type of oral contract duties here involved. The cases cited above all involve a written insurance contract, work contract or service contract from which a clear duty founded in contract can be extracted. Such is not the case here. After review of this subject, no case law can be found which would allow a tort duty to arise out of a contractual obligation as unclear as the obligation asserted here. Had there been a written contract or even sufficient evidence of an oral contract which adequately detailed an intended mode of delivery originally contemplated by the parties, the result may have been different. *See, Westerhold v. Carroll,* 419 S.W.2d 73, 80 (Mo.1967); *Allen v. Kraus,* 358 Mo. 520, 215 S.W.2d 739, 741 (1948); *Morgan v. Wartenbee,* 569 S.W.2d 391, 397 (Mo.App.1978); *State ex rel. Cummins Missouri Diesel Sales Corp. v. Eversole,* 332 S.W.2d 53 (Mo.App.1960).

Conversely, the evidence here shows that for three years prior to the alleged accident there has been no suits for breach of contract. The only evidence concerning the terms of the contract are inconclusive. Finally, although appellant attempts to pile inferences from subsequent conduct to establish the contract, if anything, the actions of the parties indicate there was never any definite mode of delivery originally agreed upon by the parties. Even if a tort duty can arise out of an oral contract, appellant's evidence here certainly is not sufficient to plow this new ground.

In sum, because appellants did not carry their burden of proving some affirmative contractual obligation to provide adequate means of transporting the cylinders into the crime lab by respondent, this court cannot charge the trial court with error for failing to find a tort duty assumed by respondent out of that obligation.

For these reasons, the judgment of the trial court is affirmed.